No. 30,380.

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general;
THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY; THE
CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY; THE
MISSOURI PACIFIC RAILROAD COMPANY; THE MISSOURI-KANSAS-
TEXAS RAILROAD COMPANY; THE ST. LOUIS-SAN FRANCISCO RAIL-
WAY COMPANY; and THE UNION PACIFIC RAILROAD COMPANY,
*Plaintiffs*, v. THE PUBLIC SERVICE COMMISSION OF THE STATE OF
KANSAS, and JESSE W. GREENLEAF, THURMAN HILL and CHARLES
W. CAMPBELL, as Members of the Public Service Commission of
the State of Kansas, *Defendants.*.

(11 P. 2d 999.)

Opinion filed June 4, 1932.

*William R. Smith, Alfred A. Scott, C. J. Putt, Luther Burns, John E. Du-Mars, T. M. Lillard,* all of Topeka, *W. P. Waggener,* of Atchison, *W. W. Brown,* of Parsons, and *W. F. Lilleston,* of Wichita, for the plaintiffs.

*Charles W. Steiger* and *Earl H. Hatcher,* both of Topeka, for the defendants; *Bernard L. Glover* and *Byron M. Gray,* both of Kansas City, Mo., of counsel.

The opinion of the court was delivered by

DAWSON, J.: This is an original action in quo warranto in which the plaintiffs challenge the authority of the public service commission to exercise certain powers conferred upon it by chapter 223 of the Session Laws of 1929.

As first instituted the six major railway companies doing business in Kansas appeared as plaintiffs, but when their authority to maintain the action was informally questioned from the bench, the attorney-general on his oral application was given leave to enter the state *ex relatione* as party plaintiff so that legal questions touching the validity of the statute could be decided in orderly fashion for the benefit of everybody concerned.

It will be necessary to set out the statute here:

"AN ACT relating to railroad companies and other common carriers and providing for the issuing of certificates by the public service commission covering unjust, unreasonable, discriminatory and/or unduly preferential rates and charges theretofore exacted.

"*Be it enacted by the Legislature of the State of Kansas:*

"SECTION 1. No railroad company or other common carrier shall charge, demand or receive from any person, company or corporation an unreasonable, unfair, unjust or unjustly discriminatory or unduly preferential rate or charge for the transportation of property, or for hauling or storing of freight, or for use of its cars, or for any service afforded by it in the transaction of its business as a railroad company or common carrier; and upon complaint in writing made to the public service commission that an unfair, unjust, unreasonable or unjustly discriminatory or unduly preferential rate or charge has been

exacted, such commission shall investigate said complaint, and if sustained, shall make a certificate under its seal setting forth what is, *and what would have been,* a reasonable and just rate or charge for the service rendered, which shall be *prima facie* evidence of the matter therein stated.

"SEC. 2. It shall be lawful for any railroad company or other common carrier to refund to any person, company or corporation any unreasonable, unfair, unjust or unjustly discriminatory or unduly preferential rate or charge which it has exacted, received or collected from any shipper, in accordance with the certificate referred to in section 1 hereof.

"SEC. 3. Complaints seeking certificates as described in section 1 hereof shall be filed with the public service commission not more than three years after the payment of the rates or charges complained of therein.

"SEC. 4. The provisions of this act shall extend to and include rates or charges exacted by any railroad or other common carrier within six years prior to the enactment hereof: *Provided,* Complaints seeking certificates as described in section 1 hereof are filed with the public service commission not more than two years after this act takes effect: *And provided further,* That complaints or other actions relating to the matters embraced in section 1 hereof which have been abated or dismissed, due solely to the omission of chapter 124, section 11, of the Laws of Kansas of 1883, from the Revised Statutes of Kansas of 1923, shall be reinstated upon appropriate motion therefor filed within one year from the time this act takes effect.

"SEC. 5. Any proceeding in court relating to the matters embraced in this act shall be brought not more than one year after the issuance of a certificate by the public service commission.

"SEC. 6. If any section, clause or phrase of this act is for any reason held to be unconstitutional, such decision shall not affect the remaining portions of this act. The legislature hereby declares that it passes the act, each section, sentence, clause and phrase thereof irrespective of the fact that any one or more of the same shall be declared unconstitutional.

"SEC. 7. All acts and parts of acts in conflict herewith are hereby repealed.

"SEC. 8. This act shall take effect and be in force from and after its approval and publication in the official state paper.

"Approved March 16, 1929.

"Published in official state paper March 20, 1929." (Laws 1929, ch. 223, R. S. 1931 Supp. 66-154a *et seq.*)

In plaintiffs' petition it is alleged that pursuant to this statute the defendant commission is exercising jurisdiction of complaints in which certificates of reparation are sought on freight rates charged on intrastate shipments on bills of lading issued after the act of 1929 took effect, upon which the rates exacted were those specified in tariffs filed with the public service commission in conformity with the provisions of R. S. 66-117 and which had become effective by authority and consent of the commission without formal hearing.

It is also alleged that the commission is exercising jurisdiction

of complaints in which reparation certificates are sought on intrastate shipments on bills of lading issued after the act of 1929 took effect where the rates collected were those specified in tariffs which the commission, upon hearing and investigation under the provisions of R. S. 66-113, had found to be reasonable and had ordered to be put into effect.

Another questioned power of the commission is that of entertaining complaints for reparation certificates on any and all intrastate shipments during a period of six years prior to the enactment of the statute of 1929 where the freight charges were those exacted in accordance with the tariffs filed with the commission, some of which were made effective with its consent and authority but without a hearing, and others where the tariffs were filed and approved by the commission upon hearing and investigation.

The petition alleges that the statute under which the defendant assumes to entertain the foregoing complaints for reparation certificates is unconstitutional and void in all its parts for the following reasons, to wit:

(1) That the statute vests judicial power in the commission in violation of article 3, section 1 of the state constitution, which vests the judicial powers of the state in judicial tribunals and not elsewhere.

(2) That the statute confers powers upon the commission the exercise of which will impair the contract obligations between the shipper and the carrier in violation of article 1, section 10 of the United States constitution.

(3) That the statute confers powers the exercise of which will violate the rights of the carriers protected by the fourteenth amendment, and particularly that the retroactive features of the statute will deprive the railroads of their property without due process of law and deny them the equal protection of the law.

The petition also alleged that the carriers have raised these questions of law in cases pending before the commission where reparation certificates are demanded under the colorable authority of the statute of 1929, and that the constitutional objections to the statute have been overruled; and that the carriers are now confronted with the necessity of incurring burdensome expense in preparation for the trial of the aforesaid complaints; and that such ruling of the commission is bound to precipitate a multiplicity of suits and cause the expenditure of large sums of money by the carriers and commission

alike, and also by complainants seeking reparation certificates under the statute.

The relief sought is an authoritative adjudication touching the constitutionality of the statute, and that the commission be ousted from the exercise of any and all powers assumed by it under color of its authority.

1. The first objection to the statute is that it confers judicial power upon the public service commission, which is a tribunal created by the legislature with authority to exercise certain legislative functions which the legislature finds it impracticable to exercise itself—rate making, and supervision of the affairs of public utility services in this state. It is urged that judicial powers can only be exercised by the courts of the state created for that purpose and that legislative and judicial powers cannot be exercised by one tribunal under our constitution. (*In re Sims,* 54 Kan. 1, 11, 37 Pac. 135; *State v. Johnson,* 61 Kan. 803, 60 Pac. 1068.)

As generally understood a court is a judicial tribunal which has power to hear and decide justiciable controversies and to give binding judgments thereon. · The powers conferred on the commission by the statute under scrutiny do not extend so far. By its terms the commission is authorized to investigate complaints concerning unjust rates which the carriers have exacted, and to make a certificate as to what is or would have been a just rate; but the commission is not authorized to make binding adjudications of right between carrier and complainant. The recitals of the certificate are *prima facie* evidence if or when demand for reparation becomes the subject of controversy before a court of competent jurisdiction. It is settled law that the legislature may prescribe what matters shall have the force of *prima facie* evidence. (*Jones v. Hickey,* 80 Kan. 109, 102 Pac. 237; *Reitler v. Harris,* 80 Kan. 148, 102 Pac. 249.) In *State v. Marshall,* 95 Kan. 628, 148 Pac. 675, it was said:

"That the legislature may change the rules of evidence, even to affect pending cases, is settled law. (*Jones v. Hickey,* 80 Kan. 109, 102 Pac. 247; *Reitler v. Harris,* 80 Kan. 148, 102 Pac. 249; *Petersilie v. McLachlin,* 80 Kan. 176, 178, 180, 101 Pac. 1014.) Nor does such a statute offend against due process of law. (*Hopt v. Utah,* 110 U. S. 574, 587; *Reitler v. Harris,* 223 U. S. 437, 442.)" (p. 631.)

The earlier statute referred to in section 4 of the act under consideration (Laws 1883, ch. 124, § 11) was carried into succeeding compilations until repealed in 1898 (Laws 1898, ch. 29), as part of the general scheme to regulate railroads by a court of visitation

(Laws 1898, ch. 28). It was reënacted, slightly amended, in 1901, as a part of the legislative purpose to recreate the board of railroad commissioners and define its powers (Laws 1901, ch. 286, § 21; Gen. Stat. 1915, § 8419) and remained in effect until omitted from the Revised Statutes of 1923, and was almost verbatim with section 2 of the act of 1929. The only substantial change is the inclusion of the words *"and what would have been"* in section 1 of the new statute set out above, which we have italicized for convenience. While section 11 of the statute of 1883 apparently never provoked any litigation which found its way into this court, the reports of the board of railroad commissioners and its official successors are laden with cases where reparation claims were heard, allowed, adjusted, denied or dismissed, according to their merits. Instances, which could be indefinitely multiplied, appear in the First Annual Report, Board of Railroad Commissioners (1883), pp. 210, 229; Sixteenth Annual Report, ditto (1898), pp. 194, 195; First Report, Public Utilities Commission (1911-1912), p. 58; Fourth Biennial Report, ditto (1917-1918), p. 50; First Annual Report, Court of Industrial Relations (1920), pp. 83, 88, 126, 135.

Even the elision of the reparation section of the act of 1883 from the Revised Statutes of 1923 did not terminate the commission's practice of granting orders of reparation. In the Ninth Biennial Report of the Public Service Commission (July 1, 1926, to June 30, 1928), page 835, we read:

"Docket No. 8605: The Midland Valley Rld. Co.
  Application for reparation on crude oil from Aumann Sput to Arkansas City, Kan.
        Granted August 24, 1926."

We have gone into the foregoing at some length to verify the accuracy of defendant's contention that a reparation statute substantially like section 1 of the act of 1929 under consideration, for forty years was administered by the tribunal charged with that duty, acquiesced in by the carriers, and that the enactment of the later public utilities act of 1911 was not construed to repeal or supersede it in its entirety. And while the courts were never called upon to construe the statute of 1883 or the possible bearing of the utilities act of 1911 thereon, the operative construction given to the act of 1883 by the successive official boards charged with administering it over a long period of years cannot be ignored by the courts. (*Harrison v. Benefit Society,* 61 Kan. 134, 59 Pac. 266; *Bank v. Reilly,* 97 Kan.

817, 823, 156 Pac. 747; *Songer v. Bank Commissioner*, 114 Kan. 900, 901, 220 Pac. 1060; *Cavlovic v. Baker et al.*, 118 Kan. 412, 415, 416, 234 Pac. 1009; *State, ex rel., v. State Highway Comm.*, 132 Kan. 327, 337, 295 Pac. 986.) In *Marinette, T. & W. R. Co. v. Railroad Comm.*, 195 Wis. 462, where the power of the railroad commission of Wisconsin to grant a refund of freight charges established by the commission was under consideration, it was held:

"The practical construction of a statute long followed by the railroad commission, with the apparent acquiescence of the legislature as well as those affected thereby, is entitled to great weight." (Syl. ¶ 1.)

And so far as the act of 1929 is substantially the same as that of 1883 it seems superfluous to observe that what was a valid part of the statutory fabric for the regulation and government of public carriers in this state for forty years until repealed in 1923 could surely be restored to that fabric by legislative enactment in 1929. Mayhap the utilities act of 1911 modified or abridged to some extent the scope of the act of 1883. As a later expression of the legislative will it would have that effect if the two could not be harmonized. But by the same token the act of 1929, with which we have now to deal, became in turn a later expression of the legislative will than the utilities act of 1911, and to that extent, if any—that the acts of 1911 and 1929 are in conflict—the older statute would have to yield to the more recent. In *In re Moseley's Estate*, 100 Kan. 495, 164 Pac. 1073, it was held that older statutes must be read in the light of later enactments, and are subordinated thereto and must be harmonized therewith; otherwise the older statutes must give way to the later enactments and by implication are necessarily modified, superseded or repealed thereby. To like effect were: *Arkansas City v. Turner, State Auditor*, 116 Kan. 407, 226 Pac. 1009; *Great Western Portland Cement Co. v. Public Service Comm.*, 121 Kan. 531, 247 Pac. 881; *City of Wichita v. Wichita Gas Co.*, 126 Kan. 764, 271 Pac. 270.

Whatever infirmities we may discover in the statute of 1929 as we proceed, it does not, in our opinion, confer judicial power on the public service commission, and the statute is free from constitutional objection on that point. In other jurisdictions the same constitutional objection to statutes giving similar powers to regulatory commissions has been uniformly overcome. (*L. & N. R. R. Co. v. Greenbrier Dist. Co.*, 170 Ky. 775; *Turner C. Co. v. C., M. & St. P. Ry. Co.*, 36 S. D. 310; *State, ex rel. Tacoma, Etc., R. Co. v. Pub.*

*Serv. Com.*, 112 Wash. 629; *Chicago & N. W. R. Co. v. Railroad Commission*, 156 Wis. 47, 53; *Chicago, M. & St. P. R. Co. v. Railroad Com.*, 194 Wis. 24.)

2. Touching defendant's next objection to the act, that it impairs the obligation of contracts between shipper and carrier, we shall have something to say below, but for the nonce we must remark that existing statutes are integral parts of every valid contract just as much as if they were written at length into the instruments which constitute the contracts. When the statute of 1929 became effective, March 20, 1929, in contemplation of law it became a part of every shipper's contract thereafter made which dealt exclusively with *intrastate* transportation by public carriers. And so far as the statute of 1929 authorizes the payment of refunds on reparation certificates issued on account of unreasonable, unfair, unjust, or discriminatory or preferential charges exacted for transportation services *after* March 20, 1929, a majority of this court holds that the act is not subject to the constitutional objections urged against it. This conclusion applies to sections 2 and 5 of the act, and so far as it looks only to the future it applies to section 3.

3. A much graver question arises, however, when we come to consider section 4, the purport of which is to bestow upon shippers a right to reparation certificates for any and all intrastate shipments of property by railroads and other common carriers for a period of six years prior to the enactment of the statute of 1929, the apparent and avowed purpose of the section being to create a *prima facie* basis for a right of action through the issuance of such certificates for the period from December 27, 1923, when the act of 1883 was omitted from the Revised Statutes of 1923 until restored in substance by section 1 of the act of 1929. It is suggested by defendant that such retroactive legislation is justified where it merely restores a remedy for an existing liability. They reason in this fashion: It was the continuing duty of the carriers never to charge more than just and equitable rates for transportation; and every unjust rate and charge was illegal during the six years' interval that the reparation statute was off the books, and that its reënactment merely restored a remedy for any and every breach of such continuing duty. Remedies, however, may be changed; they may be dropped and something else tried; and they may be restored. While the reparation provision was off the books, the other remedies for the exaction of unfair rates remained—by complaint to the commission to obtain

just rates. This may not have been so effective a remedy as that furnished by the reparation statute of 1883, but it cannot be said that the legislature had no power to experiment with the efficacy of the utilities act of 1911 without the support of the reparation statute of 1883. While the utilities act of 1911 stood unaffected by whatever modifying influence the reparation statute of 1883 had theretofore exercised upon it, the published rates of the carriers on file with the commission were the only lawful rates which the carriers could charge. Those rates were a part of every contract. To depart from them was a misdemeanor subjecting the carrier to severe penalties. (R. S. 66-177.) If those rates were not charged and collected the carriers had an action to recover the amount of the undercharge. If an overcharge departing from the published rates were exacted the shipper had an action to recover the overcharge. (R. S. 66-130, 66-140, 66-178.)

In *Great Western Portland Cement Co. v. Public Service Comm.*, 121 Kan. 531, 247 Pac. 881, the plaintiff sought by mandamus to compel the public service commission to make a finding that the published rates for the transportation of crude oil were unjust and unreasonable and to find what rates would be just and reasonable. The commission moved to quash. In the opinion the legal effect of dropping the act of 1883 from the Revised Statutes of 1923 was discussed. It was there said:

"The omission of the section in question from the revision amounted to its repeal. It can hardly be conclusively presumed that the legislature omitted it upon the theory that it was superfluous, but even in that case the presumption would not avail to preserve its force. A belief on the part of the legislature itself that the omitted statute was covered by remaining provisions, if such were not the fact, could not constrain the courts to so hold.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"A consideration, however, which we regard as clearly controlling, and which does away with the occasion for a fuller discussion of the matters already mentioned, is this: Rates of carriers are now fixed by the tariff sheets on file. A carrier can lawfully charge neither more nor less than the rate so fixed. This condition has existed for many years. The alternative writ of mandamus indicates the time at which the overcharges were made which are the basis of its complaint no more definitely than to say that it was 'prior to May 3, 1925.' The presumption is that the charges complained of were in accordance with a then existing rate sheet, there being no allegation to the contrary. That being the case, there is no occasion for the commission to make an inquiry or finding as to whether the rate was reasonable. The following cases, while not involving statutes identical in language with our own, apply the same

principle: *Steel Corporation v. Pub. Serv. Com.,* 90 W. Va. 74; *E. L. Young Heading Co. v. Payne,* 127 Miss. 48; *Texas & P. Ry. Co. v. Railroad Commissioners,* 137 La. 1059; *Santa Fe G. & C. M. Co. v. A., T. & S. F. Ry. Co.,* 21 N. M. 496; *Utah-Idaho C. Ry. Co. v. Pub. U. Com.,* 64 Utah, 54; *Murphy v. N. Y. C. R. R. Co,* 225 N. Y. 548. This view makes it unnecessary to consider whether the omitted section, if it had been retained in the revision, would be constitutional." (pp. 532, 535.)

The shippers' contracts which were executed between December 28, 1923, and March 20, 1929, were performed by the carriers' services and paid for in conformity with the then existing law. Can they now be made the basis of a valid claim for reparation on any theory that the rates exacted during that interval are subject to a *post hoc* attack under the statute of 1929? The carrier's right to the published rate at the time it was collected was its property. Can the carrier now be compelled to refund any part of it in view of the constitutional inhibition that no person shall be deprived of his property without due process of law?

In Myer on Vested Rights, section 33, it is said:

"Where a state constitution contains no provision in terms against the passage of retrospective laws, or laws affecting rights and remedies in pending proceedings, the validity of such statutes will depend upon the nature of the objects to which they relate, or the consequences which attend their application in particular cases; and unless they bear injuriously upon some private or vested right, or fall without the domain of general legislative power, or violate some constitutional interdict, the courts have no authority to pronounce against them. (Citing cases.) If an act, whether general or special, public or private, operates retrospectively to take what is, by existing law, the property of one man, and, without his consent, transfer it to another, it is in violation of the guaranty of due process of law."

In Cooley's Constitutional Limitations, 542, it is said:

"Every law that takes away or impairs rights vested, agreeably to existing laws, is retrospective and is generally unjust, and may be oppressive; and there is a good general rule, that a law should have no retrospect; but there are cases in which laws may justly, and for the benefit of · the community, and also of individuals, relate to a time antecedent to their commencement; as statutes of oblivion or of pardon. They are certainly retrospective, and literally both concerning and after the facts committed. . . . Every law that is to have an operation before the making thereof, has to commence at an antecedent time, or to save time from the statute of limitations, or to excuse acts which were unlawful, and before committed, and the like, is retrospective."

In 6 R. C. L. 304, 305, it is said:

"A distinction is drawn between *ex post facto* laws and retrospective laws.

Every *ex post facto* law must necessarily be retrospective, but every retrospective law is not necessarily an *ex post facto* law; and so retrospective laws, in so far only as they are also *ex post facto* laws, are prohibited. . . . Retrospective laws are ordinarily deemed to be oppressive, although there are cases in which laws may justly, and for the benefit of the community and also of individuals, relate to a time antecedent to their commencement.

"Retrospective laws relate to civil rights and civil proceedings, and the term retrospective has a meaning analogous to the words *ex post facto* as applied to criminal and penal statutes. The courts have recognized that without violating a constitutional prohibition as to retrospective legislation the state may make laws for the extenuation or mitigation of offenses, for the enforcement of existing contracts, and, in general, laws curing defects in the remedy, or confirming rights already existing, or adding to the means of securing and enforcing them. If a retrospective act which is neither an *ex post facto* law nor one impairing the obligations of a contract should nevertheless operate so as to take away a right of property, it may still be unconstitutional and void, not because it is retrospective, but by reason of its repugnancy to constitutional provisions guaranteeing due process of law, or for some other constitutional reason, as, for example, where it amounts to an improper assumption of judicial power by the legislature."

While retroactive legislation is not always subject to constitutional infirmity it has always been looked on with disfavor. In 25 R. C. L. 786, 789, it is said:

"Purely retrospective laws involve the exercise of judicial rather than strictly legislative power. Operating not only on future rights and liabilities but also on matters that occurred, or rights and liabilities that existed, before the time of enactment, they pronounce judgment on what was done before their enactment. Every law that takes away or impairs rights that have vested under existing laws is generally unjust and may be oppressive. Hence such laws have always been looked on with disfavor. It is a maxim, which is said to be as ancient as the law itself, that a new law ought to be prospective, not retrospective, in its operation. . . . Especially will a statute be regarded as operating prospectively when it is in derogation of a common-law right, or the effect of giving it retroactive operation will be to destroy a vested right or to render the statute unconstitutional."

Illustrative of the application of these principles was *Richards v. City Lumber Co.*, 101 Miss. 678, where plaintiff, who was injured in his master's planing mill, sued to recover damages for his injury. One of the defenses pleaded was contributory negligence. Plaintiff raised the point that under a recent statute contributory negligence was not a defense to an action like plaintiff's. Plaintiff's injury occurred on March 30, 1910; the statute relied on became effective April 16, 1910, and the action for damages was begun on January 12, 1911. The statute declared that in all actions *hereafter brought*

it should be controlling. But the court, to preserve its constitutionality, would not permit it to be given the retroactive effect of depriving defendant of the defense which the law permitted when the cause of action arose, saying—

"The legislature has no power . . . [to] . . . destroy a valid defense to an action existing before the enactment of the statute." (Syl. ¶ 4.)

In *Grand Rapids v. Lake Shore, Etc., R. Co.,* 130 Mich. 238, 97 A. S. R. 473, it was held that a statute attempting to create a personal liability to pay assessments previously made on land, where no liability existed when the assessments were made, was unconstitutional and void.

In *Philip v. Heraty,* 147 Mich. 473, 118 Am. St. Rep. 554, the action was for the death of a person whom plaintiff claimed to have been her husband. The supreme court held that it was open to defendants to prove that she was not thus related to the deceased. Then the legislature enacted a statute to cover the situation where a person believed himself or herself in good faith to be married might maintain an action for the wrongful death of the ostensible spouse. In the new trial granted, plaintiff successfully invoked that statute in the court below, but the supreme court held that a statute giving a right of action for wrongful death to a person who in good faith sustained the marriage relation to the decedent, when there existed a legal impediment to their marriage, was unconstitutional in so far as it authorized the maintenance of an action for the death of a man which occurred prior to the enactment of the statute.

In *Bucher v. Fitchburg Railroad,* 131 Mass. 156, plaintiff brought an action for damages for injuries sustained while traveling on defendant's freight train. The answer set up that plaintiff was traveling on the Lord's day in violation of law. The injury was received in August, 1876, at which time the law forbade traveling on Sunday except for necessity or charity. On May 15, 1877, a statute was enacted which provided that the earlier statute prohibiting Sunday traveling should be no defense to an action for damages for injuries sustained through the tort of another. The trial court applied that statute to plaintiff's cause of action, but the supreme judicial court ruled otherwise, holding that although the language of the statute was sufficient to embrace cases arising as well before as after its passage, yet it would not be given a retroactive effect, and that the railway could maintain the special defense pleaded.

The foregoing cases are not closely analogous to the question we

have at bar. They merely illustrate the correct judicial attitude in dealing with retrospective legislation. Such precedents as are found in our own reports are no closer. In *Comm'rs of Sedgwick Co. v. Bunker,* 16 Kan. 498, the action was for mandamus to compel the county clerk of Harvey county to enter upon the tax roll certain taxes on lands which had theretofore been part of Sedgwick county but which became part of Harvey county by detachment under an act of the legislature. The act had expressed the legislative intention that territory detached from one county and incorporated into another should not thereby be released from paying its equitable proportion of the bonded indebtedness of the county to which it had formerly belonged, but statutory machinery was not provided for making that legislative purpose effective. At the next session of the legislature a statute was enacted covering that detail. This court upheld the subsequent statute, saying:

"There is no constitutional provision in this state against retrospective legislation, where such legislation is designed and intended to afford civil remedies or relief in cases where there is an existing moral obligation to do or perform the act or duty prescribed thereby; and to this extent such legislation is valid." (Syl. ¶ 2.)

This early case is a good example of retrospective legislation against which there is no constitutional objection. It dealt exclusively with a matter of public concern, of governmental affairs. No private interest was invaded. To like effect were: *Board of Education v. State,* 64 Kan. 6, 67 Pac. 559; *School District v. Board of Education,* 110 Kan. 613, 204 Pac. 758. But the limits of retrospective legislation were overstepped in *Felix v. Wallace County,* 62 Kan. 832, 62 Pac. 667, even where only public interest was concerned. Of course, a statute which merely changes the remedy is not unconstitutional, although it is applied retroactively. (*Berry v. K. C. Ft. S. & M. Rld. Co.,* 52 Kan. 759, 34 Pac. 805.)

On the other hand, retrospective legislation which attempts to impair vested rights or deprive a private litigant of a right he had at the time the later statute was enacted cannot be enforced. (*Richards v. Comm'rs of Wyandotte Co.,* 28 Kan. 326, 331; *Barrett v. Montgomery County,* 109 Kan. 685, 201 Pac. 1098; *Serrault v. Price,* 125 Kan. 548, 265 Pac. 548; *Almquist v. Johnson,* 130 Kan. 417, 286 Pac. 217.)

Applying the rule derivable from the foregoing precedents and textbook doctrine, the court is constrained to hold that the shippers' contracts which were made and performed during the interval when

there was no reparation statute in existence are immune from any belated assault under authority of section 4 of chapter 223 of the Session Laws of 1929, R. S. 1931 Supp. 66-154d, by the federal constitution which forbids any state to pass a law impairing the obligation of contracts (U. S. Const., art. 1, § 10) ; and to the extent that section 4 is designed in text and terms to create a basis for a cause of action in behalf of a shipper for the exaction of a rate which the carrier was bound to charge under compulsion of statute, breaches of which were punishable by criminal prosecution, it violates the vested rights of the carrier under the provisions of the fourteenth amendment; it likewise offends against those orderly rules and principles for the administration of justice which constitute due process of law; and it is therefore unconstitutional and void.

It should be observed, however, that the subject matter of section 4 is inherently severable without impairing the remainder of the statute, and section 6 expressly provides that a constitutional infirmity in any part of the statute shall not affect the remainder.

4. The foregoing should conclude discussion in this case, but as the validity of the statute in its *futuro* aspects is sustained we are urged to give a declarative judgment touching the applicability of the statute on rates filed with and approved by the commission without formal hearing, and on specific rates expressly ordered to be filed after hearing and deliberate determination of the commission. Answering the last question first, it seems clear that when a rate has been the subject of a deliberate inquiry in which the carriers, the shippers and the commission's own experts have participated, as well as any and all other persons who cared to take a hand in it as the statute provides and permits (R. S. 66-111, 66-112, 66-113), any rate so prescribed by the commission and put into effect by the carriers may be confidently collected and retained by them as their very own, without misgiving that at some future time a further hearing of the commission may be had and more evidence taken and a different conclusion reached, and those rates condemned as unreasonable, and reparation certificates allowed for the difference between the rates which the commission did authorize and the rates which it should have authorized. Such a method of regulating public utilities has none of the earmarks of due process of law nor the simplest notions of justice. Nor would it be worth the while of any shipper to receive such a reparation certificate, for it would not serve as a justiciable basis of recovery. That point, at

least, was laid at rest by the recent decision of the supreme court of the United States in *Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U. S. 370, 52 S. Ct. 183, where it was held that where the rate exacted by a railway carrier was established by deliberate order of the interstate commerce commission, that tribunal could not thereafter subject the carrier to liability for the payment of reparation by declaring that the rate the commission had previously fixed was in fact unreasonable. Counsel for the defendant direct our attention to the fact that two justices of the supreme court dissented from the judgment, but we do not see how that affects the binding force of the adjudication. Moreover, it is not possible to distinguish in principle a case where the interstate rate exacted is promulgated after a hearing by the federal commission and a case where the intrastate rate is similarly ordered into effect after a hearing by the state commission. Other courts have reached the same conclusion in the consideration of claims for reparation for payments on freight shipments where the charges, when made, were those prescribed by public authority. (*St. Louis-San Francisco Ry. Co. v. State*, [Okla. Mar. 1, 1932] 8 P. 2d 744, and citations.)

5. Yet another question is submitted for our solution. It relates to the shippers' right to a reparation certificate in cases where the rates exacted were filed with the commission and perfunctorily approved by it without hearing and determination of their reasonableness, but which rates are afterwards found to have been unjust, unreasonable or otherwise unfair and discriminatory against the shipper. Under the interstate commerce act, as administered by the federal commission, reparation is permitted in such cases. The I. C. C. reports and textbooks on interstate transportation are laden with cases of that sort. (Watkins Shippers and Carriers, 4th ed., 416 *et seq.*) Statutory proceedings for reparation for the exaction of rates in excess of what is reasonable, as found by some proper state board corresponding to our public service commission, are also recognized as valid under state laws not substantially different from our own. (*State, ex rel. Tacoma, Etc., R. Co., v. Pub. Serv. Com.*, 112 Wash. 629; *Turner C. Co. v. C., M. & St. P. Ry. Co.*, 36 S. D. 310; *Katz-Craig Contracting Co. v. Chicago, St. P., M. & O. R. Co.*, 93 Neb. 674; *Marinette T. & W. R. Co. v. Railroad Comm.*, 195 Wis. 462.) See, also, 4 Am. Dig. Dec. Ed., Carriers, § 202; 5 Third Dec. Dig. §§ 200-202.

The point is made on behalf of the carriers that rate schedules

filed with a state commission are on a different footing from those filed with the federal commission in this respect: A schedule of interstate freight rates filed with the interstate commerce commission goes into effect in thirty days unless that commission makes an order suspending them, whereas no schedule of intrastate rates filed with the usual state commission goes into effect unless and until the state tribunal makes an order authorizing them. A majority of this court holds that this procedure is one of form merely, not of substance. The public service commission is not equipped to make a critical analysis of an entire schedule of rates, and its approval is necessarily *pro forma,* and the rates thus approved will merely stand as legal for the carriers to exact until it develops in actual practice that particular instances reveal them to be oppressive or otherwise unreasonable. Rates so filed and perfunctorily approved are conveniently and aptly designated as permissive. (*Brimstone R. R. Co. v. United States,* 276 U. S. 104; *Eagle Cotton Oil Co. v. Southern Ry. Co.,* 51 F. 2d 443.) The supreme court of the United States has given this construction to a schedule of Kansas rates for utility services to which our state commission had given mere *pro forma* consent. (*Wichita R. R. v. Pub. Util. Comm.,* 260 U. S. 48, 56, 57.)

It is true that this court is not bound by the federal supreme court's interpretation of a Kansas statute, and we declined to follow its construction of one phase of the utilities act in *Consolidated Flour Mills Co. v. Kansas Gas and Electric Co.,* 119 Kan. 47, 237 Pac. 1037; but the great learning of that tribunal is always helpful; and we discern some practical difficulties in giving a schedule of intrastate rates filed with and casually approved by our state commission different significance from that given to a schedule of interstate rates similarly filed with the interstate commerce commission and put into effect by the carriers on mere sufferance of the federal commission. In practice the principal freight tariffs include both local and interstate rates, thousands of them, with rules for making calculations of millions of other rates. These identical tariffs are filed with the state and federal commissions, for the convenience of shippers and carriers alike, and to save further complexity of a subject which is complex enough at its best.

Cases from other jurisdictions are cited which give so much potency to the approval of a schedule of rates by the state commission that there is no practicable room for the allowance of repara-

tion awards. Typical of these is *State, ex rel. Railroad, v. Public Service Commission*, 303 Mo. 212. In that case the point was urged by counsel, although not decided by the court, that Missouri had no reparation statute. However, we have such a statute, and a field for it to function must be found in the fabric of our statutory law.

To conclude: This court holds that the statute of 1929 does not vest judicial power in the public service commission; there is no inherent constitutional invalidity in the statute in so far as it is merely a reënactment of one which was repealed by its omission from the Revised Statutes of 1923; so far as section 3 of the statute may affect shippers' contracts *in futuro* and the rights of the carriers thereunder it is not unconstitutional, but in its retroactive aspects it is violative of that provision of the federal constitution which forbids the state to pass any law impairing the obligation of contracts; section 4 of the act, being designed in text and terms to disturb vested rights and to deprive the carriers of their property without due process of law, is unconstitutional and void; since the reënactment of this reparation statute in 1929 it may and does affect rates exacted by the carriers since it became effective, where those rates were only perfunctorily approved by the public service commission; but the statute cannot be construed to apply to rates which the carriers have exacted pursuant to a hearing and deliberative order of the public service commission.

Judgment will be entered accordingly and the costs will be divided between the litigants.

It is so ordered.