No. 35,870

CONTINENTAL INVESTMENT CORPORATION and ATLANTIC OIL CORPO-
RATION, *Appellees*, v. THE STATE CORPORATION COMMISSION OF
THE STATE OF KANSAS, *Appellant.*

(137 P. 2d 166)

Opinion filed May
8, 1943.

*Harold Medill*, of Independence, and *Kenneth W. Wagner*, of Topeka,
argued the cause, and *Richard B. McEntire*, of Topeka, was on the briefs for
the appellant.

*Mark H. Adams*, of Wichita, argued the cause, and *Charles E. Jones* and
*J. Ashford Manka*, both of Wichita, were on the briefs for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This case had its inception in an application to
the State Corporation Commission for an order permitting the ap-
pellees to increase their allowable production of two oil wells owned
and operated by them in Ellis county.

An understanding of the controversy will require the pertinent
facts to be stated at some length. Fortunately there is no dispute
about the facts. But first let us briefly take note of the pertinent
law.

The enactment of chapter 226 of the Session Laws of 1931 con-
ferred upon the public service commission (now called the State
Corporation Commission, G. S. 1935, 74-601c) the authority and
duty to make rules and regulations for the production of crude oil,
to prevent waste, and to prevent the inequitable or unfair taking
from any common source of supply and to prevent discrimination
between producers. This statute was amended in 1933 (chapter
214) by enlarging the statutory significance of the term "waste,"
and by broadening the scope of the powers and authority of the

public service commission, the attorney-general, and the county attorney to enforce compliance with the valid orders and regulations of the commission. (G. S. 1935, 55-601 *et seq.*)

The statute was further amended and the powers of the commission were enlarged and clarified by the enactment of 1939 (ch. 227; G. S. 1941 Supp. 55-602 *et seq.*). We may note two changes in the law made by the 1939 enactment which are especially pertinent to the issues here presented. Prior statutes had not provided specifically for proration of allowable production of oil as between pools. The new act did so. Prior statutes provided for proration between wells within pools on the sole basis of the productivity or "potential" of the individual well in relation to the total productivity of all the wells in the pool. In addition to other changes not necessary to note, the new act introduced for the first time an acreage factor for consideration along with productivity or "potential" in fixing the allowable production of the individual wells—or, to use the language of the statute, "the acreage reasonably attributable" to each well.

The potential production from existing oil wells in Kansas is estimated at several million barrels per day, but the available market demand at the times covered by this record did not exceed 230,000 barrels per day. (At this writing it is 318,809 barrels per day.) This economic quandary necessitates drastic curtailment of crude-oil production, and the state corporation commission has issued orders and prescribed regulations from time to time, as operative experience has suggested, to deal with the situation.

Some years ago an oil pool was discovered in township 12 south, range 18 west, in Ellis county, which came to be known as the Walters pool. The Continental Investment Corporation and the Atlantic Oil Corporation acquired from one Jensen an 80-acre lease in that pool, the west ½, S. W. ¼, sec. 12, town. 12 S., range 18 W.

Immediately south of the Jensen lease was an 80-acre lease held by the British-American Oil Producing Company, designated in the record as the Karlin lease, W. ½, N. W. ¼, 13-12-18.

On the next 80-acre tract west of the British-American's Karlin lease, the Republic Natural Gas Company had a lease acquired from one Joy, the E. ½, N. E. ¼, 14-12-18.

Between January, 1938, and August, 1939, the appellees completed two producing oil wells on the south 20 acres of their Jensen lease, spacing each well in the center of a 10-acre allotment. The British-

American company likewise completed two producing oil wells near the north end of their Karlin lease, spacing them in 10-acre allotments. The Republic company also developed a producing oil well in the northeast corner of its Joy lease, assigning to it a 10-acre allotment.

From a plat of the Walters pool, we excise and reproduce the part of it which shows the *locus* of the three 80-acre leases and the five oil wells of the three producers whose correlative allowable production based on the acreage attributable to their respective wells will be considered as we proceed. The appellees' producing wells on the Jensen lease are marked 1 and 2; the British-American producing wells on the Karlin lease are marked 1 and 2; and the Republic company's producing well on the Joy lease is marked 1. All five of these wells produce oil from the same horizon, the same geological formation, and from the same source of supply.

On September 1, 1939, the state corporation commission promulgated a rule relating to the spacing of oil wells and apportioning a specified acreage to each well. That rule was amended and promulgated on December 1, 1939, fixing the minimum acreage attributable to each well at ten acres and prescribing its maximum allowable production. But this amended rule, designated Rule 109-E, authorized any producer to convert his 10-acre well into a 20-acre well by drilling another well (called a "validating" well) properly spaced from the first, and if such other well proved to be a producer, the 10-acre well would be rated as a 20-acre well and its operator would thus be entitled to an increased allowable production. It may be inferred that the allowable production of a 20-acre well would be double that of a 10-acre well but the record does not say so.

Following the promulgation of Rule 109-E as amended on December 1, 1939, the British-American company drilled a validating well on its south half of its Karlin lease, marked 3 on the plat, thus establishing its right under the rules of the commission to increase the production of their first two wells by attributing a 20-acreage allowable to each of them. The Republic company followed the same course and completed a second well on its Joy lease. Its validating well is marked 2 on the plat.

The appellees did not take advantage of the commission's amended Rule 109-E, but continued to operate their two 10-acre wells at the same allowable production as theretofore.

Rule 109-E as amended was in force from December 1, 1939, until November 1, 1941, at which time it was again amended materially, the effect of which was to excuse the drilling of a validating well under certain circumstances. The last amended rule, in part, reads:

"Wells located approximately in the center of tracts containing 20 acres or less, the length of which does not exceed twice the width, shall be attributed acreage factors equal to the number of acres in such tracts. . . .

"ADMINISTRATIVE INTERPRETATIONS:

. . . . . . . . . . . . . . .

h. Acreage is attributed to wells primarily for the purpose of protecting correlative rights, . . . Consequently, productivities and acreage are used in conjunction with each other for the purpose of fixing well allowables, that is, the well's just and equitable share of the oil which is being currently produced by the pool. . . .

i. Where acreage lies so that it can logically be attributed to more than one well, it shall be equally distributed among them, unless correlative rights would be impaired by the resulting allowables."

Another administrative interpretation of the rule as amended in November, 1941, in part reads:

"After the provisions of Rule 109-E, as amended herein, become effective, the respective acreage factors established for the several wells shall not be readjusted retroactively."

For some considerable time the appellees did not discover the disadvantage they were under in comparison with their competing neighbors, the British-American and the Republic companies, although appellees regularly received the elaborate monthly reports of the commission prescribing its oil proration orders for the entire state. An examination of these monthly reports would have shown that their neighbors in the Walters pool were producing under 20-acre well allowables, but that source of information was entirely ignored. The president of the Continental Investment Corporation, one of the claimants, was quite candid on this point. While he testified, as his company's petition had alleged, that the state corporation commission, without notice to his company, had changed the Republic company's 10-acre well allocation on its Joy lease to a 20-acre well allocation and the British-American's two 10-acre well allocations on its Karlin lease to 20-acre well allocations, his examination, in part, proceeds thus:

"Q. You are furnished, then, I take it, notice of our [the commission's] monthly hearings and monthly reports? A. Yes, sir.

. . . . . . . . . . . . . .

"Q. You were a subscriber, back in March, 1940, to that service? A. Yes, sir.

"Q. Handing you what the reporter has marked exhibit 5, I will ask you to identify that, if you know what it is, please. A. Yes, it is the oil proration order and report for March, 1940.

. . . . . . . . . . . . .

"Q. Now I will ask you to turn to the portion of the schedule that shows the Walters Arbuckle pool. That is on pages 60 and 61 of the schedule? A. Yes, sir.

"Q. Are you familiar with these figures, etc., contained in those reports? A. Yes, sir.

"Q. Will you explain what these figures 20 in parenthesis means? A. Means they are given twenty acre allowable.

. . . . . . . . . . . . .

"Q. Now I understood you to testify that you did not have any knowledge of this twenty acres to that well until a few months later? A. *We did not catch it until September or October.* (Our italics.)

"Q. But that information was in your office at the time, in that report? A. Yes.

"Q. And had you examined the report you would have been able to determine that well had twenty acres allowable? A. Yes, sir.

"Q. Is that also true of the well of the British-American, it received twenty acres in October? A. We found that, or discovered that in October, 1940, then we went back to the Republic to see when they first got this twenty acre spacing.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. You knew that wells drilled as your wells 1 and 2 were drilled on your lease would only receive ten acres unless they were validated by the drilliing of an offset well on your lease, you knew that? . . . A. Yes.

"Q. And if such an offset well was drilled on your lease a twenty acre offset well, it would increase (wells) 1 and 2 to twenty acres? A. Yes.

"Q. That was not done by your company? A. No, sir.

"Q. Do you know whether it was done in relation to the wells drilled by the British-American? A. Yes.

"Q. They validated their two wells 1 and 2 by drilling well No. 3? A. Yes, sir.

"Q. And in regard to the Republic Well No. 1, that was validated into a twenty-acre well by drilling well No. 2? A. Right.

"Q. Both of those leases, British-American and Republic lease, in validating their wells, increasing to twenty acres, was in keeping with the rules and regulations in effect? A. At that time.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. And if you had drilled it as British-American did, then under the old rules that would have given you twenty acres allowable for the three wells? A. Yes.

"Q. Did you ever appear at any of the monthly allocation hearings since March 30? A. No.

"Q. You never appeared in any hearing? A. No.

"Q. This is the first appearance before the commission you have made? A. Yes.

"Q. Did you ever file any objection or · application for a rehearing (to) any of the monthly allocation orders since March 30, regarding this point? A. No, sir."

On March 3, 1942, the Continental Investment Corporation, one of the appellees, filed an application with the commission, in which it alleged at length the matters narrated above, reciting the existence of the commission's rule effective December 1, 1939, and its alteration effective November 1, 1941. It quoted from an administrative interpretation of that rule, and alleged that eventually it, too, took the requisite steps to have a 20-acre well allowable production accorded to its two wells on its Jensen lease. It set out an elaborate table of figures which tended to show that from March, 1940, to October, 1941, while its neighboring competing producers in the same pool were enjoying the privilege of 20-acre well production allow-

ables, the petitioner fell behind in its allowable production to the extent of 20,793 barrels; and to redress that alleged inequality and to restore its correlative rights, it prayed for an order granting it 20-acre allotments to each of its two wells on its Jensen lease, to be effective retroactively as of March 1, 1940, and that it be granted such back allowables to recoup its alleged "shortage" or "underage" in the amount of 20,793 barrels of oil.

This application was heard by the commission. Witnesses testified at length but without material dispute of fact. On April 6, 1942, the commission made an order denying the application, and incorporated in the order certain findings and conclusions, to some of which we must give space. In part these read:

"Applicant requests that its wells now be granted an additional allowable, in the nature of an underage, to make up for the oil produced by said offset wells. To this contention, the commission finds little, if any, merit. Applicant is on the mailing list of the commission. It received not only copies of the rules and regulations as they were promulgated and issued by the commission but also copies of each monthly order and report. The assertion it had no knowledge of the increased acreage granted to the wells offsetting the wells on its lease is simply an admission on the part of applicant that its officers and agents failed to read the orders and reports received by them. These monthly orders and reports clearly and plainly set out the acreage factor for each of the wells in the Walters pool, including those under consideration here. Had applicant been prejudiced by reason of the increased acreage factors given the offset wells to its lease, its recourse was to petition this commission for relief in the time and in the manner provided by statute. This it did not do.

"No complaint is made as to the validity of the rules and regulations under which increased acreage factors were granted to the wells of the British-American Oil Producing Company and the Republic Natural Gas Company. In fact, it is admitted that the production from those wells was in keeping with the rules, regulations and orders of the commission.

"Applicant gives no reason why it failed to take advantage of the provisions of Rule 109-E. It had a copy of the rules and should have been familiar with the provisions thereof. Notwithstanding the fact it failed to avail itself of the privilege of increasing the acreage factors for its Wells No. 1 and 2, as authorized by Rule 109-E, it nevertheless seeks by this application to reap the benefit it would have received had it taken advantage of the provisions of that rule. We do not believe applicant is entitled to that benefit. The purpose of drilling a validating well, under the provisions of Rule 109-E, was to prove that the acreage claimed attributable to the well was actually productive of crude oil. The operator drilling such a well runs the risk of spending his money for a dry hole. The British-American Oil Producing Company and the Republic Natural Gas Company took that risk. Each of these companies drilled a producing validating well on its lease which entitled the wells located on 10-acre tracts to an increased acreage factor of 20 acres.

Applicant took no such risk. Until a validating well was drilled by applicant on its lease, it naturally follows it was not entitled to have increased acreage factors assigned to its wells No. 1 and 2.

"It is the position of this commission that its monthly proration orders fixing well allowables is final unless steps, as provided by statute, are taken to obtain a review of the order. This necessitates a petition for rehearing, which must be filed with the commission within ten days from the date of the making of the order. No such petition for rehearing was filed by applicant on any of the monthly orders issued by the commission during the period in question. Having failed to follow the procedure outlined by statute, the belated application under consideration here cannot serve as a substitute therefor."

Included in the commission's order was some comment touching the sheer impracticability of recalculating and readjusting the well allowables of the Walters Pool and ultimately the well allowables for the entire state, which would have to be taken into account if claimants' demanded—back allowable of 20,793 barrels was granted or any considerable portion of that amount. The commission concluded its comment in justification of its denying the order prayed for thus:

"However, we will end the discussion by simply stating that we feel the commission is without jurisdiction to grant the relief requested."

From that order the claimants appealed to the district court, where the cause was tried on the record made before the commission as the statute provides. (G. S. 1941 Supp. 55-606.)

The district court in an opinion which limitations of space will not permit us to include here, held that the application of the appellees should have been granted as prayed for—with the qualification that the commission would not be bound by appellees' alleged figures of its shortage or underage of 20,793 barrels, but that such shortage should be calculated by the commission in accordance with its rules and regulations and the pertinent statute. The trial court's judgment set aside the commission's order and remanded the cause with directions as indicated.

The commission brings the cause here for further review.

The excerpt from the commission's opinion and order denying the claimants' application so clearly states the substance of its counsels' argument against the judgment of the district court, that we may turn at once to appellees' brief to note the arguments they advance to sustain that judgment.

It is first suggested that Rule 109-E as effective prior to its abro-

gation on November 1, 1941, permitted inequitable and unfair taking of oil and caused unreasonable discrimination against the claimant appellees. That does not appear. Of necessity all administrative rules of officials boards are experimental, and their wisdom and justice or lack of it may only be revealed by trial and error. That is the main reason the legislature confers on such official boards the power to make rules having temporarily the force of law. Otherwise there would be no excuse for the legislature placing that responsibility on an official board when the power and duty to legislate is vested in the legislature itself. The legislative device of assigning to official boards or commissions the power to make administrative rules governing matters of public concern, with authority to change those rules as experience may justify, is a settled policy of American jurisprudence. And the fact that it developes in actual practice that any such rule may work hardship, or that it may wisely and expediently be amended and improved, is not a confession that the prior rule was illegal, nor that parties aggrieved by its operation would have a *post hoc* cause of action before the official board which had promulgated it, nor in a court of general jurisdiction. To illustrate, in years agone a familiar class of grievances which provoked many complaints before state and interstate commissions was the excessive freight rates exacted by the railroads. When those grievances were established before the proper tribunal, it ordered such rates to be reduced, effective prospectively. But for many years no redress was given to the shipper for past excessive freight charges he had already paid; although later by statutes, both federal and state, reparation for past excessive charges could measurably be awarded. (*State, ex rel., v. Public Service Comm.*, 135 Kan. 491, 11 P. 2d 999.)

Rule 109-E, which was in operation for the period under which the appellees contend that they were discriminated against in comparison with the British-American and Republic companies, gave precisely the same privilege to the appellees to have their 10-acre allowables increased to 20-acre allowables as enjoyed by their competitors if they had chosen to pursue the same course to obtain it. Hence the contention by appellees that the rule complained of was inconsistent with the statute, and permitted inequitable and unfair taking, and unreasonable discrimination is sheer bandying of extravagant words without basis in fact.

Counsel for the appellees cite the case of *State Corporation Com-*

*mission of Kansas v. Wall*, 113 F. 2d 877, where the federal court of appeals for this circuit held that the Kansas commission acted within its authority in ordering an oil producer who had exceeded its rated allowable to reduce the same below that figure until that illegal excess was extinguished. That case is no precedent to support the judgment in the one at bar. In the Wall case the producer had violated the rated allowable authorized by the commission, and certainly the commission could make and did make a valid order to correct that situation. Here the British-American and Republic companies complied strictly with the regulation of the commission permitting them to change their rated allowable production from 10-acre wells to 20-acre wells.

And since nothing prevented the appellees from similarly changing the ratable allowables of their 10-acre wells to those of 20-acre wells, they were in no position to invoke the aid of the commission nor of a court of justice to help them out of their own self-imposed predicament.

We find no point to the appellees' reiterated contention that the rated allowable production of the British-American and Republic companies was increased by the commission without notice to the claimants as required by law. The commission did not increase it at all. Appellees' rivals increased their rated allowables by taking advantage of the privilege offered to every producer in the state similarly situated. The rated allowable production of all the wells in the state and the method prescribed for a possible increase was published and circulated monthly throughout the state, and the president of the Continental company admitted that although his company received the commission's monthly orders regularly, "We did not catch it until September or October."

"Q. Has the Continental Investment Company or any of the other parties, owners of this (Jensen) lease ever petitioned the commission for a rehearing on any of the orders and reports issued, beginning with March, 1940, up until the time you were granted (relief)? A. Never filed any."

The commission's monthly oil proration order and report for March, 1940, clearly showed that the Republic Company's No. 1 10-acre well on the Joy lease had been raised to a 20-acre well. The commission's October, 1940, report showed the same enlarged acreage attributed to the British-American 10-acre wells on its Karlin lease.

Not only was there no timely complaint against the amended

Rule 109-E effective December 1, 1939, but the appellees never did attack the rule during the time it was in force. When a person has a grievance against an order or ruling of an official board, he must seek redress in conformity with the procedure prescribed by the pertinent statute. In this case, that procedure is laid down in G. S. 1941 Supp. 55-605, 55-606. Counsel for appellees argue that the commission has jurisdiction to make such an order as it applied for—to permit them to recoup their shortage or underage due to the alleged past inequity of Rule 109-E which was in vogue between December, 1939, and November 1, 1941. As we have shown, the rule was not inequitable to appellees, since they had exactly the same privilege as their competitors to enlarge their 10-acre well allowables by proving that the other acreage covered by their Jensen lease was oil-bearing territory. Furthermore, we adhere to the age-old rule that the law favors the vigilant, not those who sleep on their rights. Any relief which the law affords must be sought in timely fashion before whatever tribunal, commission or court is authorized to grant it. A statutory prerequisite to any redress for any hardship which Rule 109-E might have caused was a timely proceeding to set that rule aside during its existence. It could not be done afterwards, so the concluding observation of the commission denying the application to grant the back allowables, that it "was without jurisdiction to grant the relief requested" was logically correct.

We have not failed to examine the decisions from other jurisdictions cited by appellees, but find none of them either analogous or helpful. Moreover, the powers and duties of our state corporation commission are exclusively those which are conferred and circumscribed by our own statutes.

The judgment of the district court is reversed and the cause remanded with instructions to render judgment for defendant.

HARVEY, J., dissents.