Hart, J.
 

 Section 614-109, General Code, regulating the granting of applications for contract carrier permits, is as follows:
 

 “Before granting any permit authorizing the operation of a private motor carrier, the commission shall consider and determine whether such applicant has complied with the provisions of the law and the rules and regulations of the commission governing private motor carriers, and whether or not the operation proposed by the applicant comes within the definition of a private motor carrier, and also whether or not such proposed operation comes within the definition of a motor transportation company as provided in General Code Section 614-84. If the applicant has complied with the provisions of the law and the rules and regulations of the commission governing private motor carriers, and the commission finds the proposed operation and contract of carriage of the applicant and the other contracting party to be that of a private motor carrier and such contract to be in full compliance with the provisions of this chapter and the rules of the commission governing the same, and if the applicant is a proper person to whom to grant a permit, and the granting of such permit, or the approval of the contract as to any change or modification thereof, except
 
 *220
 
 as to contracts in the form and with the contents provided under paragraph (f) of General Code Section 614-107 and filed with the commission prior to the effective date of this act, is and will be consistent with the declared policy, and purpose, of the regulation of transportation by common and contract carriers by motor vehicle, as provided in this chapter, then a permit shall be granted, otherwise the application shall be denied, and any such contract, change or modification thereof shall be rejected by the commission.”
 

 Section 614-83, General Code, which states in very general terms the policy and objectives by which the commission shall be guided in the regulation of transportation by common and contract carriers by motor vehicle, reads as follows:
 

 “It is hereby declared to be the policy of this state to regulate transportation by common and contract carriers by motor vehicle in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by such motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, such motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of commerce and the state * *
 

 The appellants, who were protestants, complain that the commission failed to make a finding that the granting of the application would be consistent with the policy and purpose of regulation of motor carrier transportation, as declared by statute; and that there was insufficient evidence to warrant the order.
 

 The record shows that the attorney examiner did
 
 *221
 
 make some findings and these were specifically adopted by the commission in its order. The attorney examiner found that the application and all formal requirements were in proper form; that the applicant was an experienced and proper person to whom authority might be granted; that the operation proposed is that of a contract carrier; and that the contract is bilateral in nature and guarantees an adequate minimum. Besides, the commission in granting the application necessarily found that the applicant complied with the proper regulations, and that the proposed movement is within the scope of the definition of a private motor carrier. This was sufficient.
 

 An examination of Section 614-83, General Code, above quoted, discloses that it gives the Public Utilities Commission, in most general terms, the widest discretion to determine, as to any proposed movement in transportation, whether, in the public interest, it possesses inherent advantages and fosters sound economic conditions in such transportation and among carriers.
 

 In the instant case, the evidence as a whole discloses that the shipper had a transportation problem in the delivery of its products, which required a constant and flexible service which a common carrier, obliged to serve “in turn” everybody calling for its service, is unable to give. In other words, the deliveries to be made by the shipper in the instant case were of such character as to require either its own supervised delivery service as was made by it through “leased” equipment, or that a carrier which could' devote its equipment almost exclusively and constantly to shipper’s delivery service.
 

 It is quite clear from the record that there was in 1946 and 1947 a deficiency in the service of Refiners to the shipper, as a result of which the shipper was obliged to provide other delivery service of its own
 
 *222
 
 by “leased” equipment. And although there is testimony that Refiners is now in position to give service, there is no assurance that common carrier service, the only type which Refiners is in a position to give, would be adequate.
 

 The commission evidently took the position that the service of the protestants, as common carriers, was not suited to the particular delivery service required by the shipper, and that Stillpass, as a contract carrier, could supply it. The best interest of the shipper lay in the service which a contract carrier could give and this interest carried through to the jobbers who were the customers of the shipper and in turn to the public served by the jobbers. The public interest was thus better served.
 

 Under such circumstances, the order of the commission was fully warranted.
 

 The order of the commission is affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Matthias, Zimmerman, Stewart, Turner and Taft, JJ., concur.