Nos. 43,088, 43,089, 43,090, 43,091 and 43,092

CLASS I RAIL CARRIERS OF KANSAS, THE KANSAS TRANSPORT COMPANY, INC., and THOMPSON TRANSPORT CO., INC., *Appellants*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

(380 P. 2d 396)

Opinions filed April 6, 1963.

*J. B. Reeves,* of Topeka, argued the cause, and *C. J. Putt* and *W. E. Treadway,* both of Topeka, were with him on the briefs for appellants Class I Rail Carriers of Kansas.

*Erle W. Francis,* of Topeka, argued the cause, and was on the briefs for appellants Kansas Transport Company, Inc., and Thompson Transport Co., Inc.

*Carl L. Wettig,* of Topeka, Assistant General Counsel, argued the cause, and *Charles C. McCarter,* General Counsel, and *Rex A. Jemison,* both of Topeka, were with him on the briefs for the appellee.

*Arthur L. Claussen, A. Harry Crane, Ward Martin* and *Harvey Ashworth,* all of Topeka, were on the brief for intervenors Ruan Transport Companies.

*James L. Grimes, Jr., Robert L. Webb* and *Ralph W. Oman,* all of Topeka, were on the brief for intervenor Iola Transport, Inc.

The opinion of the court was delivered by

PARKER, C. J.: These are appeals from separate judgments of the district court sustaining orders of the State Corporation Commission granting contract carrier permits for the transportation of cement. The procedural facts which are complicated and not in dispute will be briefly stated.

Five applications were filed with the State Corporation Commission for contract carrier authority by motor vehicle to transport cement from various cement producing points in the State of Kansas to all points and places in Kansas. Transportation privileges were sought by Iola Transport Inc., between Iola, Kansas, and all points and places in Kansas, under contract with Lehigh Portland Cement Company; Ruan of Fredonia, between Fredonia, Kansas, and all points and places in Kansas, under contract with General Portland Cement Co.; Ruan of Kansas, between Independence, Kansas, and all points and places in Kansas, under contract with Universal Atlas Cement, Division of U. S. Steel Corp.; Ruan of Chanute, between Chanute, Kansas, and all points and places in

Kansas, under contract with Ash Grove Lime and Portland Cement Company; and Ruan of Des Moines, between Humboldt, Kansas, and all points and places in Kansas, under contract with Monarch Cement Company.

These applications were opposed before the commission by the Class I Rail Carriers of Kansas and by various motor common carriers duly certified to transport cement by motor vehicle as common carriers in Kansas intrastate commerce.

The first four of these applications were heard before the commission on a common record. By orders dated May 25, 1960, the commission denied each of such applications. Applicants then sought and obtained a rehearing before the commission. The fifth application was heard before the commission on December 22, 1960.

On March 23, 1961, the commission served on all parties its orders in all five cases, setting aside the four prior orders of denial, and granting each of these five motor contract carrier permits. Timely applications for rehearing were filed by the Class I Rail Carriers of Kansas; the Kansas Transport Company, Inc.; and Thompson Transport Co., Inc., hereinafter referred to as the appellants, pursuant to G. S. 1949, 66-118b.

The commission took no action on the applications for rehearing within the statutory period, whereupon, under provisions of 66-118b, *supra,* such applications were properly regarded as denied. Thereupon appellants filed applications for review of each of these five cases in the district court of Shawnee County, as authorized by G. S. 1949, 66-118c. The district court consolidated all five cases for purposes of trial and, after a hearing, issued its orders dated January 9, 1962, sustaining the commission in its grant of the involved contract carrier permits. Following the overruling of motions for new trial, the appellants, common carriers by rail and common carriers by truck, filed five separate appeals. The five applicants appeared as intervenors in the court below and also appear as such here.

The orders issued by the commission granting these five contract carrier applications are identical except for formal parts, and the matters complained of by appellants are common to each case. For that reason the five cases, appealed as above indicated, have been consolidated in this court pursuant to stipulation of the parties that the decision in one case will control the decision in the

other cases and that the same decision may be entered in all five cases.

The appellants contend that the statutes of Kansas permit the grant of a contract carrier permit only when there have been specific findings in accordance with prescribed standards that there would be no unfair competition against common carriers or their customers by such a grant, and that the transportation need cannot be met by existing common carriers. They also contend that the specific findings must appear on the face of the commission's order as an indispensable prerequisite to its validity.

The appellants further contend that the order of the commission does not contain the requisite finding that there does not exist sufficient common carrier service to adequately meet the public needs nor does it contain a specific finding that applicants would not violate the standards established by G. S. 1949, 66-1,112e, forbidding contract carriers to discriminate or engage in unfair competition against common carriers and their patrons. They also suggest that the uncontested evidence does not support the necessary findings.

The statutes will first be reviewed for the purpose of determining what standards are prescribed as prerequisites to the granting of contract motor carrier permits.

G. S. 1949, 66-1,112a, gives authority to the commission to grant contract motor carrier permits; regulate and supervise accounts and operations; prescribe necessary rules and regulations necessary to carry out the provisions of the act; and regulate "all matters affecting the relationship between such motor carriers and the traveling and shipping public and other carriers."

G. S. 1949, 66-1,112b, requires that notice of a hearing on a contract carrier application be served on "every common carrier that is operating, or has applied for a certificate to operate, in the territory proposed to be served by the applicant," and declares the same to be "an interested party" with the right to offer testimony in the proceedings. The same section vests the commission with power to grant or refuse the application or to grant it for the partial exercise only of the privilege sought. In addition it authorizes the commission to attach to the exercise of the privilege granted by such permit such terms and conditions as in its judgment will carry out the purposes of the act.

G. S. 1959 Supp., 66-1,112c, now G. S. 1961 Supp., 66-1,112c, provides for the supervision or revocation of a permit in cases of violation of specified rules and regulations.

G. S. 1949, 66-1,112d, is a policy provision anticipating constitutional objections and provides:

"It is hereby declared that the business of contract motor carriers is affected with the public interest, and that the safety and welfare of the public, the preservation and maintenance of the public highways and the integrity of the regulation of common carriers require the regulation of contract motor carriers to the extent herein provided."

G. S. 1949, 66-1,112e, is a provision against discrimination and unfair competition and provides as follows:

"Every contract motor carrier operating in competition with one or more common carriers is hereby forbidden to give or cause any undue or unreasonable advantage or preference to those whom he serves, as compared with the patrons of any public motor carrier, as that term is used in this act, or the patrons of any other common carrier, or to subject the patrons of any such common carriers to any undue or unreasonable discrimination or disadvantage, or by unfair competition to destroy or impair the service or business of any public motor carrier, as that term is used in this act, or of any other common carrier, or the integrity of the state's regulation of any such service or business; and to the end that the said commission may enforce these provisions, each such contract motor carrier shall maintain on file with the commission a statement of his charges and of such other matters as the commission may require."

G. S. 1949, 66-1,112f, covering regulation of rates and charges reads:

"The commission is hereby vested with power and authority and it is hereby made its duty to prescribe rules and regulations covering the operations of contract motor carriers in competition with common carriers of this state, and the commission shall prescribe minimum rates, fares and charges to be collected by such contract motor carriers."

The appellants, referring to the statutes considered, suggest:

"The foregoing makes it abundantly clear that before a contract carrier permit may be authorized, the Commission must find:

"1. That there does not exist sufficient common carrier service to adequately meet the public needs.

"2. That the contract carrier will not give or cause any undue or unreasonable advantage or preference to those whom he serves, as compared with the patrons of any common carrier.

"3. That the contract carrier will not subject the patrons of any common carrier to any undue or unreasonable discrimination or disadvantage.

"4. That the contract carrier will not by unfair competition destroy or impair the service or business of any common carrier or destroy or impair the integrity of the State's regulation of the common carriers."

There may be some merit to appellants' first suggestion that the commission must find that there does not exist sufficient common carrier service to adequately meet the public needs but we believe that their suggested required findings Nos. 2, 3 and 4 are not contemplated by the statute as findings prerequisite to the granting of the permit. These suggested findings were gleaned largely from the provisions of G. S. 1949, 66-1,112e. The provisions of this section against discrimination and unfair competition apply to a contract motor carrier after the permit is granted. It is the duty of the commission to supervise and regulate contract motor carriers. If a contract motor carrier engage in discrimination and unfair competition, the commission should suspend or revoke the permit under the provisions of G. S. 1961 Supp., 66-1,112c.

We are impelled to conclude that G. S. 1949, 66-1,112e, deals with authorized contract motor carriers "operating in competition with one or more common carriers," that it deals only with what a contract motor carrier does after the permit is granted, and that it is not a statute establishing prerequisites to the granting of a contract motor carrier permit. It would be presumptious to require the commission to make a finding that a contract motor carrier would never violate any of the provisions of the motor carrier act before the commission could grant a permit.

In considering the necessity of a finding by the commission that there does not exist sufficient adequate common carrier service before granting a contract motor carrier permit, the five applicants, intervenors here, contend:

". . . In granting an application for contract motor carrier rights, no requirement is made that the commission find that the proposed contract service will promote public convenience and necessity, or that the commission shall take into consideration other existing transportation facilities and their adequacy or inadequacy."

They further state that G. S. 1949, 66-1,112a and 66-1,112b, are the only statutes establishing standards controlling the commission in granting or denying contract motor carrier permits and that they make no reference to the adequacy of existing common carrier service. We do not agree with this contention.

The commission appears to concede that there must be a finding of inadequacy in existing common carrier service. It states in its brief:

"The requirements which are generally made by public service commissions to entitle a contract carrier to a permit are as follows:

"1. That the carrier is ready, able and willing to perform the contract;

"2. That the shipper is desirous of utilizing its services as evidenced by a contract;

"3. That there exists some inadequacy in the existing common carrier service as applied to a particular shipper;

"4. That the award of the contract carrier permit is not contrary to the public interest."

The commission further notes in reference to its suggested finding No. 3 above:

"This requirement · is not unlike appellants' contention that one of the main purposes of the motor carrier act is to protect common carriers 'where there exists sufficient common carrier service to adequately meet the public needs.' . . . The question at issue, regardless of how stated, is whether the common carriers in this case offer adequate service to the public or whether there exists some inadequacy." (See appellee's brief page 24, footnote 6.)

This court is committed to the proposition that one of the main purposes of the contract motor carrier act is to protect common carriers where they furnish adequate service to meet public needs. In *Baldwin v. State Corporation Comm.*, 143 Kan. 580, 56 P. 2d 453, with reference to what is now G. S. 1949, 66-1,112b, it is stated:

". . . The pertinent portion of that statute provides:

" 'The commission is hereby vested with power and authority to grant or deny the permit prayed for, or to grant it for the partial exercise only of the privilege sought, and may attach to the exercise of the privilege granted by such permits such terms and conditions *as in its judgment will carry out the purposes of this act.*' (Italics inserted.)

"It clearly appears one of the main purposes of the act is to protect common carriers by rail and common carriers by motor vehicle alike in territory where there exists sufficient common carrier service to adequately meet the public needs. . . ." (585.)

The adequacy of existing common carrier service being one of the main standards governing the commission's determination of the propriety of a contract motor carrier permit, a finding in connection therewith is a prerequisite to a valid order granting such permit.

There must be findings by the commission on all applicable standards which govern its determination. (*Central Kansas Power Co. v. State Corporation Commission*, 181 Kan. 817, 316 P. 2d 277.)

The courts dignify the commission's findings with a presumption of validity in reviewing the property of its orders. No presumption of validity can attach to its orders in the absence of findings on standards which govern the commission's authority.

The courts review the commisison's findings for the purpose of determining the validity of its orders. They may disagree with its

findings, but they cannot initiate them regardless of the preponderance of the evidence.

In *Atchison Ry. v. United States*, 295 U. S. 193; 79 L. Ed. 1382, 55 S. Ct. 748, the court dealt with an order of the Interstate Commerce Commission, and stated:

". . . Its report does not disclose the basic facts on which it made the challenged order. This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order. In the absence of a finding of essential basic facts, the order cannot be sustained. *Florida v. United States*, 282 U. S. 194, 215. Recently this court has repelled the suggestion that lack of express finding by an administrative agency may be supplied by implication. *Panama Refining Co. v. Ryan*, 293 U. S. 388, 433. See *Beaumont, S. L. & W. Ry. v. United States*, 282 U. S. 74, 86. *Interstate Commerce Comm'n v. Chicago B. & Q. R. Co.*, 186 U. S. 320, 341." (pp. 201, 202.)

In the recent decision of *Burlington Truck Lines v. United States* (Dec. 3, 1962), 371 U. S. 156, 9 L. Ed. 2d 207, 83 S. Ct. 239, the supreme court dealt with the necessity for express findings by an administrative agency. In striking down an order of the I. C. C., granting a certificate, the court held:

". . . Expert discretion is the life blood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' *New York v. United States*, 342 US 882, 884, 96 L ed 662, 663, 72 S. Ct. 152 . . . The Commission must exercise its discretion under § 207 (a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id 346 US at 91. And for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' *Phelps Dodge Corp v. NLRB*, 313 US 177, 197, 85 L ed 1271, 1284, 61 S Ct 845, 133 ALR 1317. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. . . . (pp. 215 and 216, 9 L. Ed. 2d.)

The commission appears to recognize the necessity of appropriate findings. In its brief it states:

"Upon judicial review of orders of the Commission, the principal function of the reviewing court is two-fold: (1) to determine whether the Commission's orders are lawful and (2) to determine whether the orders are reasonable *and contain adequate findings* supported by substantial and competent evidence." (Emphasis supplied.)

Keeping in mind that under the stipulation of the parties we are concerned on appellate review with only one of the five appeals, the order of the commission in one of the cases should next be considered for the purpose of determining whether there is implicit therein a finding of inadequate common carrier service. So far as here material it reads:

"A reconsideration of the original record of the case indicates that the granting of this application for contract authority is in the public interest and that , there is a need by shippers for this specialized type of transportation of cement by motor carriers.

"The Commission further finds that the contract carrier type of service affords some specialized service that is somewhat better suited to the needs of cement plant shippers than in common carrier type of service, generally speaking.

"But we also find that all cement plants in the State of Kansas have adamantly refused to use or even try the common carrier type of motor carrier service that has been available for some months, and for that reason, the adequacy or inadequacy thereof has not been demonstrated by practice and experience.

"G. S. of Kansas, 66-112b (sic) 66-1,112b, gives the Commission authority to grant or deny applications for contract carrier authority (permit) or to grant on such terms and conditions as, in its judgment, will carry out the purposes of the act."

After making the above findings the commission proceeded to express concern about price fixing in the industry, and whether the granting of a contract carrier permit would foster not only the control of the price of cement but also its transportation and destination. In this connection the order states:

"We have some concern about whether the granting of contract carrier authority will make possible and foster the kind of discrimination and unfair competition prohibited by our Kansas Statutes, particularly G. S. 66-1,112. But on the basis of evidence at hand, we cannot at the present time say that there is or will be such discrimination and unfair competition."

The commission reviewed its authority to supervise and regulate contract motor carriers and the prohibitions against unreasonable preferences or unfair competition and, in view thereof, directed that the order denying the application be set aside and that a contract carrier permit to transport property, cement in bulk and in bags, be granted.

The commission conditioned its order on the contract for transportation not being "contary to public policy nor prejudicial to or discriminatory against the public or other users and further, subject to the rights of the commission which is hereby expressly

reserved to impose such terms, conditions or limitations in the future as it may find necessary in order to insure applicant's operations conform to the provisions of section 66-1,112e, General Statutes of Kansas."

There can be no question but what the commission's findings lack much to be desired both as to adequacy and definiteness. This is well demonstrated by the additional facts suggested in the commission's brief as supporting the reasonableness of its order and established by the evidence.

However, we are constrained to hold that the first two paragraphs of the commission's heretofore quoted findings are the equivalent of a finding that the common carrier service does not adequately meet the public needs. The public, insofar as this controversy is concerned, is the cement industry, consisting of the producer, seller, purchaser and user of cement. It is evident that the specialized type of service referred to in such findings cannot be furnished by common carriers.

See *Ruettger et al., Aplnts., v. Pa. P. U. C.,* 164 Pa. Superior Ct., 388, 64 A. 2d 675, where it is said:

". . . Where the evidence presents a definite conflict as to a public need for an applicant's service in an area, it is for the Commission to determine whether the available equipment and facilities are sufficient and adequate to meet the public demands, and the extent of competition to be allowed is largely an administrative question within the sound discretion of the Commission. *Ferrari v. Pennsylvania Public Utility Commission,* 163 Pa. Superior Ct. 24, 29, 60 A. 2d 602; *Kulp v. Pennsylvania Public Utility Commission,* 153 Pa. Superior Ct. 379, 381, 33 A. 2d 724. Absolute necessity for the additional service is not the test, although 'accommodation' or 'convenience' of the public are factors to be considered. *'It is sufficient "to show that the existing service is not of a type or character which satisfies the public need and convenience* and that the proposed service would tend to correct or substantially improve that condition"'*: Kulp v. Pennsylvania Public Utility Commission,* supra, 153 Pa. Superior Ct. 379, 382, 33 A. 2d 724, 725. . . ." (Emphasis supplied.) (p. 392.)

The difference in the kinds of service which legally may be offered by common carriers versus contract carriers was recognized in *Egner & Son v. P. U. C.,* 153 Ohio St. 215, 91 N. E. 2d 1, where the Supreme Court of Ohio stated:

"In the instant case, the evidence as a whole discloses that the shipper had a transportation problem in the delivery of its products, which required a constant and flexible service which a common carrier, obliged to serve 'in turn' everybody calling for its service, is unable to give. In other words, the deliveries to be made by the shipper in the instant case were of such character

as to require either its own supervised delivery service as was made by it through 'leased' equipment, or that [of] a carrier which could devote its equipment almost exclusively and constantly to shipper's delivery service." (p. 221.)

It may be conceded the unusual expressions of concern contained in the commission's order, certainly do not strengthen its position. However, the fact that the commission recognized possible evils that may grow out of the granting of a permit and its power to control them, should not be used as a basis for striking down an otherwise valid order.

It appears that the granting of the contract motor carrier permit will not tend to divert any business from existing common carriers by motor. (See the third paragraph of the four heretofore quoted paragraphs of the commission's order.)

When a shipper intends to utilize private carriage if the contract carrier permit is denied, then the grant or denial of the contract carrier permit has no practical nor legal effect upon the common carrier. Compare *Salt Lake-Kanab Freight Lines v. Robinson,* 9 Utah 2d 99, 339 P. 2d 99, where it is said:

". . . Here the evidence indicates that the granting of this contract carrier authority will not deprive the common carrier of any business, but the contract carrier will only haul freight which the contractees have in the past hauled in their own trucks and which they claim they will haul in the future if the contract carrier authority is not granted because they claim they can haul this freight in their own trucks for less than the plaintiff common carrier rates. . . ." (p. 102.)

We have no difficulty in determining that the record discloses an abundance of substantial competent evidence to support the commission's finding that shippers of cement need a specialized service which is better suited to contract carrier than common carrier type of service.

The evidence may be briefly summarized as follows:

The cement industry is highly competitive. Since cement is a standard product, an engineer or contractor seeking to purchase cement will not pay one-half cent more for one brand in preference to another. Sales are based strictly on price and efficient timely service. The cement plants in Kansas are in direct competition with cement plants in the neighboring states of Missouri, Oklahoma, Nebraska, Colorado, Texas and Arkansas. In the states where the cement plants use truck service, the ability to provide similar truck service is essential to the survival of the Kansas cement manu-

facturer. If the Kansas cement industry is deprived of adequate truck service, it will be incapable of competing with their out of state competitors.

The Kansas cement industry has received many requests for truck deliveries and users of cement have expressly told the Kansas cement manufacturers to provide truck delivery service or be prepared to forego their business. The inability of the Kansas plants to provide truck delivery service has resulted in the loss of hundreds of thousands of dollars of business. The reason the public demands such service is that it provides for their needs more adequately. Delivery by truck is faster for short hauls and permits less than car load deliveries. The greatest advantage of truck delivery service lies in the efficiency and economy of direct delivery to off-rail sites. If the commission does not grant applications for contract carriers, the industry will inaugurate private carrier service of its own. The cement industry has certain shipping problems which require specialized transportation. Contract carriers can, and the contracts presented, provide that the trucking facilities and the maintenance department be domiciled on or adjacent to the premises of the cement manufacturers. The manufacturers produce from five to six different kinds of cement. If a motor carrier appears on the cement manufacturer's premises with equipment which has in the past been carrying one type of cement and a manufacturer happens to be loading another type of cement, either the truck has to wait or the manufacturer has to clean his conveyor system in order to load the truck.

One of the great advantages that contract carriers have over common carriers is that they are not tied to a direct route. The cement can be loaded at the plant and be delivered directly to job site. Where common carrier service is used, particularly by rail, the cement is loaded at the plant, transported to some destination along the line, and then loaded into a truck for transportation to the job site.

There is ample evidence to support the findings of the commission, the findings are sufficient to justify the order, the order is neither unlawful nor unreasonable and should not be disturbed by a reviewing court.

It follows the judgment of the district court sustaining the respective orders of the commission must be upheld. Therefore, based on the stipulation of the parties, the judgment in each case, i. e., Nos. 43,088, 43,089, 43,090, 43,091 and 43,092, here involved, is affirmed.

FATZER, J., dissenting: With profound respect for the judgment of my colleagues, I must express my disagreement with the court's affirmance of this case. The decision is basic and vital to the transportation of property in the state and has far reaching results. The appellee seeks to present this litigation as just another rail versus truck fight; that is not the case. The real issue is common carrier service by rail and motor vehicle versus contract motor carriers. I shall state my views to the extent time permits.

The appellants contend, and I concur, that the provisions of G. S. 1949, 66-1,112d and e, make it clear that before a contract carrier permit may be authorized, the commission must make an affirmative finding with respect to the four criteria or standards detailing the special and limited circumstances under which a contract carrier permit may be issued pursuant to section 66-1,112e, and as set forth in the court's opinion, they are:

"1. That there does not exist sufficient common carrier service to adequately meet the public needs.

"2. That the contract carrier will not give or cause any undue or unreasonable advantage or preference to those whom he serves, as compared with the patrons of any common carrier.

"3. That the contract carrier will not subject the patrons of any common carrier to any undue or unreasonable discrimination or disadvantage.

"4. That the contract carrier will not by unfair competition destroy or impair the service or business of any common carrier or destroy or impair the integrity of the State's regulation of the common carriers."

The foregoing standards have long been followed by the commission in its orders and decisions and reflect the statutory interpretations applied during the formative years of motor carrier regulation in Kansas. No continuing publication of commission decisions is available but see *Kansas Motor Carrier Cases* by Samuel E. Bartlett, 1940; Bowen Contract Carrier Application, Docket No. 20,214-M; Murphy Contract Carrier Application, Permit No. C 2-22; Palmer Contract Carrier Application, Docket No. 20,439-M; Horrall Contract Carrier Application, Docket No. 727-M, and Sanders Contract Carrier Application, Docket No. 21,378-M. These standards were applied by the commission as late as May 25, 1960, when it denied the applications of the five applicants here involved. In that order, which was set aside by the commission's order of January 12, 1961, here involved, it was said:

". . . In determining whether such permits shall be issued, and on what terms and conditions, the Commission is not left to arbitrary action. It may

refuse or limit the permit when such action is in the public interest. The Commission may refuse or limit a permit to a contract carrier when necessary (1) to prevent 'any undue or unreasonable advantage or preference to those whom he serves, as compared with the patrons of . . . any . . . common carrier'; (2) to prevent the subjection of 'the patrons any such common carrier to any undue or unreasonable discrimination or disadvantage'; (3) to prevent by unfair competition the destruction or impairment of 'the service of any public motor carrier . . . or of any other common carrier'; or (4) to prevent the destruction or impairment of 'the integrity of the state's regulation of any such service or business.' (G. S. 1949, 66-1,112e.)"

. . . . . . . . . . . . . . .

"The motor carrier act recognizes contract carriers as a class of motor carriers who have a place in the transportation scheme. . . . *One of the purposes of conferring authority upon the Commission to grant or deny a contract carrier permit is to prevent the undue diversion of traffic from common to contract carriers.*

"If contract carriers are permitted to haul the most lucrative portion of the traffic and thus impair the ability of common carriers to continue to serve the public, the operations of contract carriers will ultimately deprive the public generally of vital motor transportation facilities. This problem is recognized as present. *Consequently the motor carrier act specifically states that contract carriers shall not be permitted to impair the integrity of the regulation of common carriers.*" (Emphasis supplied.)

It is a well-settled rule that in the construction of a statute, and particularly one of this character, the interpretation placed upon it by an administrative agency whose duties are to carry the legislative policy into effect should be given great weight, and may be entitled to controlling significances when the scope and limitations of such powers must be determined in judicial proceedings. (*State, ex rel., v. Public Service Comm.,* 135 Kan. 491, 496, 497, 11 P. 2d 999; *Graves v. Armstrong Creamery Co.,* 154 Kan. 365, 370, 118 P. 2d 613; *Southwestern Bell Telephone Co. v. Employment Security Board of Review,* 189 Kan. 600, 607, 371 P. 2d 134, and cases cited.) This is not to suggest, of course, that courts are bound to follow the interpretations of an administrative agency and they should not do so if such interpretations appear to be clearly erroneous. But the general rule is a sound one. Moreover, the Motor Carrier Act was interpreted in 1936 by this court in dealing with a contract carrier matter, and in *Baldwin v. State Corporation Comm.,* 143 Kan. 580, 56 P. 2d 453, it was said:

"It clearly appears one of the main purposes of the act is to protect common carriers by rail and common carrier by motor vehicle alike in territory where there exists sufficient common-carrier service to adequately meet the public needs." (l. c. 585.)

However, the court here sustains the commission's "turnabout" policy with respect to the application of Sec. 66-1,112d and e, by stating,

"The provisions of this section against discrimination and unfair competition apply to a contract motor carrier after the permit is granted."

In my opinion, the court's conclusion has the effect of shifting the burden of proof with respect to the standards of 66-1,112e forbidding discrimination and unfair competition from an applicant to protesting carriers. If the commission is now correct as the court concludes, then the specific "thou shall nots" directed to contract motor carriers by section 66-1,112e become mere declarations, devoid of real meaning, and impossible of enforcement. The burden of proof upon an applicant before the commission does not shift to protestants but remains in the applicant to show that pertinent standards are satisfied to entitle the issuance of a permit, or an authority. (*Community of Woodston v. State Corporation Comm.*, 186 Kan. 747, 754, 755, 353 P. 2d 206.) As the court presently construes section 66-1,112e, the sole issue before the commission on a contract motor carrier's application will be the willingness of the applicant to go into the trucking business and the desire of a shipper to use the applicant's service. A hearing on such an application would be a mere formality and the appearance of protesting common carriers a waste of time. Clearly, the statutory scheme of the Motor Carrier Act places the burden upon the applicant to prove that there does not exist sufficient common carrier service to adequately meet the public needs and that discrimination and unfair competition prohibited by section 66-1,112e are not present. An order granting a contract motor carrier's application can be valid only if it contains express findings as to each provision of 66-1,112e, and the order granting the applications here involved contains no such express findings.

In my opinion the commission's order of January 12, 1961, is unlawful and indicates a change of policy unwarranted by the statute, and the court's opinion permitting such a change is likewise a departure from the long and continuous interpretation and application of the statute by the commission, in addition to being unwarranted by the statute itself. If the commission seeks to change present applicable procedure for granting contract motor carrier permits, the road is to the legislature and not to this court.

Another reason exists why the order of the commission is unlawful. As previously indicated, before the commission may grant a contract carrier permit it must first affirmatively find that there does not exist sufficient common carrier service to adequately meet the public needs. This standard was laid down by this court in *Baldwin v. State Corporation Comm.*, supra, and so long as there exists sufficient common carrier service to adequately meet the public needs, a contract carrier authority may not be granted. An order granting a contract carrier permit is valid only when a *specific finding* has been made that such common carrier service is not available. Likewise, the order must contain an unequivocal finding that preference and discrimination forbidden by section 66-1,112e are not present. No such findings were made in the commission's order, nor could they be made under the evidence. The order simply states a conclusion wholly inconsistent with the preceding findings. It states in part, as follows:

"The Commission is concerned about price setting in this industry, the fact that cement is delivered to any given point in Kansas at a given price regardless of what cement place supplies it or the distance from which the cement is shipped, and with the fact that competition is thus limited, and is also concerned about the shipper's ability to supply or deny cement to various purchasers and/or users. There is some reason to believe that the granting of the contract motor carrier authority will foster and perpetuate this ability of cement plants to not only control the production and price of cement, but also the transportation and destination thereof. We are concerned with the same problem with which the Pennsylvania Public Utility Commission was concerned when it granted motor common carrier authority and denied contract motor carrier authority.

"We have some concern about whether the granting of contract carrier authority will make possible and foster the kind of discrimination and unfair competition prohibited by our Kansas Statutes, particularly G. S. 66-1,112. But on the basis of evidence at hand, we cannot at the present time say that there is or will be such discrimination and unfair competition."

Here the commission found that it was "concerned" about (1) "price setting," (2) "competition is thus limited," (3) "shipper's ability to supply or deny cement." The commission further found "some reason to believe" that the granting of contract carrier authorities "will foster and perpetuate this ability of cement plants" to (4) "control the production and price of cement," (5) to control the "transportation and destination thereof." Further findings were made of "concern" as to whether the granting of contract carrier authorities (6) will make possible and foster "discrimination and

unfair competition." I submit there is no rational connection between these six findings and the commission's conclusion, "we cannot at the present time see that there is or will be such discrimination and unfair competition."

The law is well settled that an administrative agency must make findings that support its decision, and those findings must be supported by substantial evidence. (*Burlington Truck Lines, Inc. v. United States* [1962], 371 U. S. 156, 9 L. Ed. 2d 207, 83 S. Ct. 239, cited and quoted from in the court's opinion.) Moreover, it is equally well settled that in the absence of the finding of essential basic facts the order cannot be sustained, and the lack of *express findings of fact* by an administrative agency may not be supplemented by implication. (*Atchison Ry. v. United States*, 295 U. S. 193, 79 L. Ed. 1382, 55 S. Ct. 748.) The court's opinion quotes four paragraphs of the commission's order and concludes "that the first two paragraphs of the commission's heretofore quoted findings are the equivalent of a finding that the common carrier service does not adequately meet the public needs." It is suggested that the conclusion supplies by implication the lack of an express finding by the commission that there does not exist sufficient common carrier service to adequately meet the public needs.

Likewise, I disagree with the court's conclusion that the third paragraph of the four quoted paragraphs of the commission's order is a finding that "the granting of the contract motor carrier permit will not tend to divert any business from existing common carriers by motor." At most, the commission's finding above referred to, that all cement plants in the state of Kansas have adamantly refused to use or even try the common carrier type of motor carrier service that has been available for some months and for that reason the adequacy or inadequacy thereof has not been demonstrated by practice and experience, is nothing more than a finding that if a shipper is large enough and sufficiently adamant, the commission will give it what it wants regardless of the public need to develop over-all transportation service available to all. Such a finding is not an affirmative finding that the present available common carrier service is not adequate and sufficient.

In view of the foregoing, I would reverse the judgment of the district court with directions to hold invalid the commission's order of January 12, 1961, as being unlawful.