No. 43,857

Jessee Darnell Truck Service of Great Bend, Kansas; Marmac Oil Field Trucking of El Dorado, Kansas; Kopfman Trucking Company of Chase, Kansas; Esfelt Trucking Inc., of Great Bend, Kansas; H. J. Jeffries Truck Line of Oklahoma City, Oklahoma; Phil Wagner Truck Service of Great Bend, Kansas; Raney Truck Service of Cunningham, Kansas; A. C. Truck Service of Great Bend, Kansas; McCurry Truck Service of Madison, Kansas; L. E. Whitlock Truck Service, Inc., of Stafford, Kansas; E. M. Keller & Co., Inc., of Pampa, Texas; W. M. Smith, dba Smith Truck Service of Perry, Oklahoma; E. M. Gregg Truck Service of Hugoton, Kansas; R. C. Williams, Inc., of Russell, Kansas; Hickerson Brothers Truck Co., Inc., of Great Bend, Kansas; Lou Tyrrell Trucking Co., of Chase, Kansas; C. & H. Transportation Co., Inc., of Dallas, Texas; and H. D. Counter Oil Field Trucking of El Dorado, Kansas, *Appellants*, v. State Corporation Commission of Kansas, *Appellee;* Thunderbird Drilling, Inc., *Intervenor.*

(397 P. 2d 385)

Opinion filed December 12, 1964.

*Leland M. Spurgeon,* of Topeka, argued the cause, and *Eugene W. Hiatt* and *Walter N. Scott, Jr.,* were with him on the briefs for appellants.

*Charles C. McCarter,* of Wichita, argued the cause, and *Robert C. Londerholm,* General Counsel, and *E. Edward Johnson,* Assistant General Counsel, for the State Corporation Commission, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The appellants are motor common carriers of property for the transportation of a full line of oil field equipment, materials and supplies, between all points and places in Kansas over irregular routes, holding certificates of convenience and necessity from the State Corporation Commission. They seek review of the order of the district court sustaining the order of the commission granting a contract-carrier permit pursuant to G. S. 1961 Supp., 66-1,115, to the Intervenor, Thunderbird Drilling, Inc., for transportation of like property between points and places in Kansas under contract with Mayfield-Smith Drilling, Inc., of Wichita.

The proceeding out of which this appeal arises was commenced when Thunderbird filed its application with the commission for a contract-carrier permit, which was set for hearing on January 11, 1962. Notice of the hearing was issued to all interested parties on December 28, 1961, pursuant to G. S. 1949, 66-1,114. On January 5, 1962, the appellants filed a motion for continuance which was allowed by the commission, and the hearing was continued until February 8, 1962. Thereafter, the appellants filed written protests to the granting of the contract carrier permit and served a copy upon the applicant and its counsel of record.

In the meantime, Thunderbird had entered into a contract with Mayfield-Smith to move its oil field rig and related equipment on January 30, 1962, to a new location. In view of the continuance of its application for contract carrier authority, Thunderbird filed an application for a temporary contract-carrier permit to operate as a contract carrier pending the determination of its application for permanent authority. Thunderbird's request for an emergency hearing recited in part:

". . . the contracting party with applicant, to-wit: Mayfield-Smith Drilling, Inc. have previously planned to have applicant move their drilling rig on or about Tuesday, January 30, 1962, and any delay in making said move would constitute a serious economic hardship to them and the use of any other carrier would be unauthorized under the terms of the contract which has previously been filed in this case."

The commission granted Thunderbird's request for temporary

authority at an *ex parte* hearing, which authority expired March 31, 1962.

On March 29, 1962, a hearing was held on Thunderbird's application for permanent authority to operate as a contract carrier in Kansas, and on May 9, 1962, the commission issued its order granting that authority.

The appellants filed an application for rehearing pursuant to G. S. 1949, 66-118b, which was allowed, and a rehearing was held by the commission on July 5, 1962. On November 8, 1962, the commission reaffirmed its earlier order of May 9, 1962, granting Thunderbird a permit to operate as a contract carrier.

Thereafter, and on December 20, 1962, the appellants filed their application in the district court of Shawnee County for judicial review of the commission's order granting Thunderbird permanent authority. A complete transcript of the documents on file with the commission and the evidence heard at the hearing and rehearing was filed in the district court. The parties filed extensive briefs, and after lengthy oral argument, the district court found the commission's order was lawful and reasonable and entered its judgment sustaining the validity of the order. This appeal followed.

The pertinent facts developed at the hearings before the commission are summarized: Since about 1953 or 1954, Thunderbird, an independent drilling contractor, owned and operated two oil drilling rigs, one truck, and certain oil and gas drilling and producing equipment. It drilled approximately 30 to 35 wells per year per rig. After a drilling rig completes a drilling assignment, it is necessary to move the rig to the next drilling location. In the past, Thunderbird accomplished that task by utilizing its own truck to haul a portion of the dismantled drilling equipment and hired common carriers to transport the remaining equipment. The evidence showed that Thunderbird's truck handled about 25 percent of the move and common carriers handled the other 75 percent.

In October, 1961, the stockholders of Thunderbird, C. W. Aikins and J. W. Owen and their wives, determined it would be useful for legal and economic reasons, to divided their operations into two corporations. Accordingly, they requested C. R. Mayfield and Edgar Smith to join them in the formation of a second corporation to be called Mayfield-Smith Drilling, Inc. Thunderbird contributed one of its two rigs for one-third of the stock in Mayfield-Smith and Mayfield and Smith contributed cash for operational capital. The

evidence further showed that the two legal entities, Thunderbird and Mayfield-Smith, needed some method of using Thunderbird's one available truck in connection with the moving of their two rigs, since "it's not economically feasible to run one truck with only one rig." Being the legal owner of the one truck, Thunderbird could continue to transport its remaining rig under its private carrier permit; however, to transport Mayfield-Smith's rig, Thunderbird needed contract carrier authority. Accordingly, Thunderbird filed its application for a contract-carrier permit to haul Mayfield-Smith's drilling equipment. There was evidence at the hearing for permanent authority that Thunderbird would continue to haul 25 percent of Mayfield-Smith's equipment and that common carriers would continue to haul the remaining 75 percent.

The specific portion of the commission's order of May 9, 1962, granting Thunderbird permanent authority, here attacked by the appellants, reads:

"The Commission further finds that the applicant will be able to perform an individualized, specialized motor contract carrier service different from, and more suitable to the needs of the shippers than any common carrier service now available."

Under *Class I Rail Carriers v. State Corporation Commission*, 191 Kan. 201, 380 P. 2d 396, the commission's finding that the specialized type of service rendered by Thunderbird was more suitable to meet the needs of the shippers than any common-carrier service now available, was equivalent to a finding that existing common carrier service was inadequate.

The appellants forcefully argue there was no substantial, competent evidence to sustain the commission's order granting Thunderbird permanent contract carrier authority. In presenting this question there is no disagreement between the parties concerning the applicable law. Upon judicial review of orders of the commission the principal function of the reviewing court is twofold: (1) To determine whether the commission's orders are lawful, and (2) to determine whether the orders are reasonable and contain adequate findings supported by substantial and competent evidence. While the appellants attack the commission's order as being unlawful, in view of conclusions hereafter announced, it is unnecessary to discuss this feature of the appeal, and we now turn our consideration to whether the record contains substantial evidence to support the

commission's order granting Thunderbird permanent authority to operate as a contract carrier for Mayfield-Smith.

Charles W. Aikins, president of Thunderbird, testified at the rehearing on July 5, 1962, as follows:

"Q. Is it your position that the existing common carrier service is inadequate for your purposes?

"A. No. Our existing permit that we have is what we have requested.

"Q. No, I am referring to common carrier authority, excluding the contract carrier certificate. Is it your position that the existing common carriers are insufficient or inadequate for your particular needs?

"A. No. That isn't the situation. The reason for the application was that we could use the truck for the two companies and that it wasn't economically feasible to run our truck just for the one company."

Mr. Edgar E. Smith, one of the owners of Mayfield-Smith, testified as follows:

"Q. Were the services of common carriers utilized?

"A. Yes.

"Q. Do you recall which carriers?

"A. No.

"Q. Did you have any complaints about the common carrier service that was rendered to you?

"A. No.

"Q. Was it highly satisfactory?

"A. Yes.

"Q. Mr. Smith, is the common carrier service to you inadequate?

"A. No.

"Q. They [Thunderbird] don't use any special equipment that is not available from common carriers?

"A. No.

"Q. What is the advantage to you that is derived from that system as opposed to using the services of a common carrier one hundred percent?

"A. The advantage would be Thunderbird would probably be more available than any carrier.

"Q. Have you ever used one hundred percent common carrier service?

"A. Yes.

"Q. What difference do you find in using one hundred percent common carrier and using twenty-five percent from this contract carrier and seventy-five percent from the common carrier?

"A. I wouldn't say there was any difference, because they both have the same equipment practically.

"Q. Do you find that the twenty-five percent that is moved by the contract carrier gets to its destination before the other?

"A. No.

"Q. What advantage is there to you in the fact that part of this load is moved by a contract carrier?

"A. Do you mean Thunderbird?

"Q. By Thunderbird.

"A. There·wouldn't be any particular advantage that I can see.

"Q. The real reason why you use Thunderbird is because they own part of your stock, is that correct?

"A. Right.

"Q. And that is the reason for your support of this application, because they own part of your stock?

"A. Right.

"Q. If it were not for the fact that Thunderbird owns a portion of your stock, would you have any reason to support this application?

"A. No, I would say I wouldn't."

The statutory scheme of the Motor Carrier Act places the burden upon the applicant to prove that there does not exist sufficient common-carrier service to adequately meet the public needs and that discrimination and unfair competition prohibited by Section 66-1,112e are not present. The Motor Carrier Act was interpreted by this court in dealing with a contract-carrier matter, and in *Baldwin v. State Corporation Comm.*, 143 Kan. 580, 56 P. 2d 453, it was said:

"It clearly appears one of the main purposes of the act is to protect common carriers by rail and common carriers by motor vehicle alike in territory where there exists sufficient common-carrier service to adequately meet the public needs." (l. c. 585.)

It is well settled in this state that an administrative agency such as the commission must make findings that support its decision and those findings must be supported by substantial evidence. (*Class I Rail Carriers v. State Corporation Commission*, supra, p. 208.)

While there was evidence that the granting of Thunderbird's permanent authority would not tend to divert any business from existing common-carrier service based upon its operational status prior to the incorporation of Mayfield-Smith, that is, Thunderbird would haul 25 percent of the drilling rig and the remaining 75 percent would be hauled by common carrier, the incorporation of Mayfield-Smith changed the status of the property contributed to Mayfield-Smith and it was incumbent upon Thunderbird to prove that existing common-carrier motor service was then unavailable and inadequate. We think Thunderbird failed in its burden of proof. From the time of the emergency hearing until the final proceeding before the commission there was no evidence presented of any fault or inadequacy of motor common-carrier service. The record discloses that the appellants were providing satisfactory service and that Mayfield-Smith never considered the service to

be inadequate. The real reason for Thunderbird's application was for its own economic advantage and not because of inadequate service of motor common carriers. Moreover, there was no evidence to support the finding that Thunderbird was able to perform an individualized, specialized motor carrier service more suitable to the needs of the shippers than existing common-carrier service. In fact, the evidence was undisputed that both had the same equipment and Thunderbird did not use any special equipment that was not available to the common carriers. At most, Thunderbird's application and Mayfield-Smith's support of it was because both were common stockholders and common officers in the two corporations. Both testified that the common-carrier service was adequate to meet Mayfield-Smith's needs, and the president of Thunderbird concluded his testimony with the statement that the reason for the application was that the mutual stockholders could use the truck for the two companies because it was not economically feasible to run the one truck for Thunderbird alone. The secretary-treasurer of Mayfield-Smith concluded his testimony with the statement that if it were not for the fact that Thunderbird owned a portion of Mayfield-Smith, he would not have any reason to support Thunderbird's application.

We conclude that the district court erred in finding the commission's order to be reasonable in view of the fact that the undisputed evidence does not support the granting of the contract carrier permit to the applicant.

In view of the foregoing, the judgment of the district court is reversed.

SCHROEDER, J., dissenting: I must respectfully dissent on the ground that the commission's order in the instant case was lawful and reasonable.

Adherence to the practice and decision of the court in this case would tend to monopolize common-carrier service and eliminate competition—granting existing common carriers more business than they had before.

Second-guessing the commission on a matter of evidence is not the function of the appellate court. The commission's finding that the applicant will be able to perform an individualized, specialized motor contract carrier service different from, and more suitable to the needs of the shippers than any common-carrier service now

available is, in my opinion, quite definitely supported by the evidence. The testimony of Edgar E. Smith to the effect that the service of Thunderbird would probably be more available than any other carrier, and thus give Mayfield-Smith an advantage, is confirmed by his further testimony that Mayfield-Smith owns part of the stock of Thunderbird.

It is common knowledge and one of the economic facts of life that ownership of an interest in a business tends to compel the obedience of those subject to the owner's control. Both the commission and the trial court must have construed this testimony to mean that the service of Thunderbird would be more available to Mayfield-Smith than the service of any other common carrier. In my opinion that is a correct interpretation of this evidence. This was a question of fact to be determined by the commission, and, having done so, it must stand as a finding of fact which supports the decision of the commission.

There is no evidence in the record that issuance of the permit to Thunderbird would take business away from other common carriers which they enjoyed prior to issuance of the temporary permit to Thunderbird.

In my opinion the decision of the court herein tends to invade the sanctity of the commission's power to make its own policy decisions within the realm of law and reason. I respectfully submit the lower court should be affirmed.